# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2016-KA-00602-COA

GRACE ANN MCCARTY A/K/A GRACE ANN WOODS A/K/A GRACE ANN PROCTOR A/K/A GRACE A. MCCARTY A/K/A GRACE MCCARTY                                    APPELLANT

v.

STATE OF MISSISSIPPI                                    APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 03/23/2016 |
| TRIAL JUDGE: | HON. JOSEPH H. LOPER JR. |
| COURT FROM WHICH APPEALED: | ATTALA COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: MOLLIE MARIE MCMILLIN |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: BARBARA WAKELAND BYRD |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 10/31/2017 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**WILSON, J., FOR THE COURT:**

¶1.    Grace Ann McCarty was indicted for depraved-heart (second-degree) murder after she killed her husband, Joel, by backing his car over him in the driveway of their home. Grace claimed that Joel's death was an accident, but the jury found her guilty of manslaughter, and the court sentenced her to twenty years in the custody of the Mississippi Department of Corrections, with five years suspended and five years of post-release supervision. On appeal, Grace argues that there was insufficient evidence to sustain the conviction and that the jury's verdict was against the overwhelming weight of the evidence. She also argues that the trial

judge should have granted her motion for a mistrial based on her allegation that Joel's cousin was "coaching" a witness during the trial. We find no error and affirm.

## FACTS AND PROCEDURAL HISTORY

¶2. Around 5 p.m. on November 2, 2014, Grace, Joel, Grace's ten-year-old daughter (Patricia), and Joel's adult son (Jay) were at the McCartys' home in Kosciusko. Jay testified that Grace and Joel were in front of the house and arguing about something. Jay could not recall the subject of the argument. Grace was "wanting to go somewhere" in Joel's car, a Chrysler PT Cruiser, but Joel told her "that she wasn't taking that car nowhere." Joel told her that "[h]e could call somebody to come get her or something," but he said, "That's the only vehicle I got right now and you're not taking it."

¶3. Jay testified that Grace got in the car despite what Joel had said. Patricia also got in the car. Joel responded by sitting down in the driveway several feet behind the car. Jay walked over to Joel and stood next to him. He urged Joel to get out of the driveway and go inside the house. Joel refused, stating that Grace was "not leaving in the car." Joel told Jay that it was "all right" and that he (Jay) should go back inside. Jay turned and started to walk back to the house. As he did, he heard the car back up and run over Joel.

¶4. Jay acknowledged that his memory was impaired as a result of head injuries that he suffered in a car accident when he was in college around 1995. He still sees a doctor about issues related to his injuries, and he takes medication for anxiety or agitation caused by the injuries. Jay testified that he takes a notebook with him everywhere and makes daily notes

2

to help him remember things, but he did not write any notes about the day that Joel was killed. Jay testified that he could remember his father being run over because an event like that will "stick" in his mind. However, he could not remember where the family had been earlier that day, what Grace and Joel were arguing about, why they had gone outside the house, or other details about the day.[1] Jay also acknowledged that he discussed the incident with Joel's relatives before he spoke to police. He did not speak to the police until two or three months after the incident, and Joel's brother and uncle went with him when he did.

¶5.     After the car backed over Joel, he was still breathing, but he was non-responsive and bleeding profusely. Grace called 911, and a recording of the call was admitted into evidence at trial. Grace told the 911 operator that she ran over Joel by accident. She said that "all [she and Patricia] were doing was going to the mailbox." An ambulance and police responded to the scene. Grace then told one of the officers that she and Patricia were going to a friend's house to retrieve Halloween decorations when she accidentally ran over Joel. Joel was taken to a local hospital and later died from his injuries.

¶6.     Grace was arrested at a gas station later that evening for driving with a suspended license. Police were called to the gas station because of an argument between Grace and Joel's other son, Shay.

¶7.     The following day, Grace gave a statement to Detective Mark Hill. Grace told Hill

_____

[1] Prior to trial, Grace moved to exclude Jay's testimony, arguing that his impaired memory rendered him incompetent to testify. The trial judge denied Grace's motion after listening to Jay's testimony outside the presence of the jury.

that she had been upset the night before and might have said some things that were not accurate. Grace said that Joel had been drinking heavily, that he and Jay were arguing, that both were very loud and upset, and that Joel had threatened to kill himself. Grace said that she and Patricia went to the car because they were afraid of Joel and Jay. She denied that she knew that Joel was sitting behind the car. Grace also told Hill that there were video cameras outside the house that might have recorded the incident, and she consented to a search of her residence for any video footage.

¶8.     Hill went to the McCartys' home to check for any video footage recorded by the outside cameras. There were three cameras outside the house, but only two were plugged in and working. One camera was pointed toward the front porch, but it did not record any footage at or near the time that Joel was run over. A camera pointed down the driveway did capture video of the incident. However, for reasons that are not clear, the video starts just before the car backs over Joel.[2]

¶9.     The video shows Joel sitting on the driveway with his legs crossed several feet behind the car. The car is already running. A male voice says something unintelligible, and then the car suddenly starts to back up. Joel tries to dive out of the way, but the car hits him. The right rear tire of the car drives over him. And then the right front tire drives over him before

_____

[2] Detective Hill testified that there was video of the family returning home earlier in the day, but that video was not played or introduced into evidence at trial. Detective Hill took possession of the SD card on which footage from the cameras was recorded. An expert in computer forensics testified at trial and confirmed that no other footage from November 2, 2014, had been saved to or deleted from the SD card.

the car finally comes to a stop. Grace and Patricia exit the car. Patricia can then be heard screaming, and Jay can be heard yelling unintelligibly at Grace.

¶10. At trial, Grace testified that on the day in question, she, Joel, Patricia, and Jay all drove to Ethel to visit her father's grave because it was her father's birthday. She testified that she drove because "Joel had been drinking too much." She testified that Joel became "upset" at the cemetery because he remembered that "he had not gotten his mother and father a tombstone yet." On the drive back to Kosciusko, Joel and Jay "argued quite a bit." When they got home, Grace started making supper, but Joel was still upset about the tombstone and about financial difficulties. Joel and Jay continued to argue, and Grace could not calm them down. Joel became "irate" and "talked about killing himself," and Jay was also angry and cursing.

¶11. Grace testified that she and Patricia were afraid of Joel and Jay. She testified that after she put supper on the table, she and Patricia slipped out the door and ran to the car. According to Grace, Joel and Jay "did not know [she] was leaving," and she did not see or hear either of them follow her outside. She testified that she turned on the car and pushed the gas, and the next time she saw Joel was "when he was in front of [the] car after [she] had run over him." The next time she saw Jay was "a few seconds later." Grace claimed that she stopped the car as soon as she realized she had hit something, although both the rear and front tires drove over Joel. Grace testified that she never saw Jay outside of the house.[3]

---

[3] However, in the recording of the 911 call, Grace can be heard saying to Jay, "You were right there with me," and, "You saw what happened."

¶12. Patricia's testimony at trial was generally consistent with Grace's testimony. Like Grace, Patricia testified that she did not see Joel outside the house until after the car had backed over him. Patricia testified that she saw Jay standing on the sidewalk next to the driveway just as the car started to back up.

¶13. Grace testified that she told the 911 operator that she was only going to the mailbox because her driver's license was suspended. Grace claimed that she was afraid that, if she told the truth, she would be arrested for driving with a suspended license and she would be not be able to go to the hospital with Joel.

¶14. Grace also claimed that when Detective Hill came to her house the next day, he found and the two of them watched a second video that was recorded by the surveillance cameras. She testified that the video showed her and Patricia running down the walkway to the car, and then Joel ran out behind them and "sat down behind [the] car" just before she backed over him. Grace claimed that, after watching the video, Hill assured her that the case should never go before a grand jury because it was "obvious" that it was an accident and that she could not have seen Joel. Grace's mother also testified that she heard Hill make these assurances. However, Hill denied that he had seen such a video or made any such statements. Grace testified that she did not "believe that [Hill] would lie" but "maybe he had forgotten" about this evidence.

¶15. During the trial, after the State and defense had both rested, Grace made a motion for a mistrial, alleging that Joel's cousin David had "coached" Jay during Jay's testimony in the

6

State's case-in-chief. In a hearing outside the presence of the jury, Grace offered testimony from three people who had been in the audience during Jay's testimony. Two of the witnesses were close friends of Grace's attorney. The third was the publisher of the local newspaper. They testified that they observed David nodding his head in an "exaggerated" manner during Jay's testimony. One testified that Jay seemed to "pause" before answering questions, but none of the witnesses observed any eye contact between Jay and David. Nor could any of them say that Jay appeared to be taking cues from David.

¶16. David and Jay both denied that any "coaching" occurred. David testified that he was simply reacting to Jay's testimony, just as he did during other witnesses' testimony. The trial judge found that the allegation of coaching was "absurd," and he denied the motion. The judge stated that he "certainly" would have noticed "any type of coaching" because he was seated "less than six feet from [Jay]" with "a complete clear view of everyone . . . in the audience of the courtroom."

¶17. After the presentation of the evidence, the court instructed the jury on depraved-heart murder, culpable-negligence manslaughter, and heat-of-passion manslaughter. Grace initially objected to an instruction on heat-of-passion manslaughter, arguing that there was insufficient evidence of provocation or "heat of passion." However, after the trial judge ruled that he would instruct the jury on culpable-negligence manslaughter, Grace's attorney specifically stated that she had "no objection" to an instruction on heat-of-passion manslaughter. The instruction on the form of the verdict did not require the jurors to specify

a theory of manslaughter if they found Grace guilty of manslaughter. The jury returned a verdict finding Grace "guilty of manslaughter." The circuit court sentenced Grace to serve twenty years in the custody of the Mississippi Department of Corrections, with five years suspended and five years of post-release supervision. The court subsequently denied Grace's motion for judgment notwithstanding the verdict or a new trial, and Grace appealed.

**ANALYSIS**

¶18. As noted above, Grace argues that the evidence was insufficient to support the conviction, that the jury's verdict was against the overwhelming weight of the evidence, and that the trial judge erred by denying her motion for a mistrial. In addition, the dissent argues that a mistake in the jury instruction on culpable-negligence manslaughter requires a new trial, although Grace did not raise the issue at trial or on appeal. We address these issues in turn.

### I. Weight and Sufficiency of the Evidence

¶19. As noted above, the trial judge instructed the jury on two theories of manslaughter: culpable-negligence manslaughter and heat-of-passion manslaughter. Grace challenges the sufficiency of the evidence and the jury's verdict on both theories. We address the two theories of manslaughter separately below, but we start with two overarching rules that govern our review.

¶20. First, our Supreme Court has held "in a number of cases and in a wide variety of contexts that, where there is in the record evidence legally sufficient to support a jury finding

8

of guilty of murder, had the jury so found, the defendant will not be heard to complain that a manslaughter instruction was given." *Jackson v. State*, 551 So. 2d 132, 146 (Miss. 1989). "This has been held so *even though the manslaughter instruction was not warranted under the evidence*." *Id.* (emphasis added). When "a defendant is convicted of manslaughter upon an instruction granted by the [S]tate to that effect and the evidence would have justified a conviction of murder, the instruction on manslaughter, *even if not authorized by the evidence*, does not constitute reversible error." *Grace v. State*, 379 So. 2d 540, 542 (Miss. 1980) (emphasis added). Therefore, in the present case, if the State presented sufficient evidence of the greater offense of depraved-heart murder, Grace cannot complain that the jury instead convicted her of the lesser offense of manslaughter—even if there is insufficient evidence of "heat of passion" or some other element of manslaughter. *Id.*; *Cole v. State*, 405 So. 2d 910, 913 (Miss. 1981).[4]

---

[4] *Accord, e.g.*, *Cook v. State*, 467 So. 2d 203, 209 (Miss. 1985); *Hubbard v. State*, 437 So. 2d 430, 438-39 (Miss. 1983); *Lowry v. State*, 202 Miss. 411, 415-18, 32 So. 2d 197, 198-99 (1947); *Adams v. State*, 199 Miss. 163, 164-65, 24 So. 2d 351, 351 (1946); *Calicoat v. State*, 131 Miss. 169, 95 So. 318, 321-22 (1923); *Holmes v. State*, 201 So. 3d 491, 494 n.4 (Miss. Ct. App. 2015); *Simpson v. State*, 993 So. 2d 400, 409-10 (¶32) (Miss. Ct. App. 2008); *Schankin v. State*, 910 So. 2d 1113, 1118 (¶13) (Miss. Ct. App. 2005); *see also Butler v. State*, 608 So. 2d 314, 320 (Miss. 1992) ("For over a half century, this Court has approved circuit courts granting heat of passion manslaughter instructions to *the State* in a homicide prosecution which is either murder or justifiable homicide committed in lawful self defense, and there is no element whatever of a heat of passion slaying . . . ."); *Taylor v. State*, 148 Miss. 713, 114 So. 823, 824 (1927) (holding that the same rule applies whether "the defense is self-defense or accidental killing" or "an alibi"). Our Supreme Court has held that manslaughter is considered a lesser-included offense in a murder indictment even when "manslaughter proof is inconsistent with that of murder." *State v. Shaw*, 880 So. 2d 296, 304 (¶27) (Miss. 2004); *see also* Miss. Code Ann. § 97-3-19(3) (Rev. 2014) ("An indictment for murder . . . shall serve as notice to the defendant that the indictment may

¶21.    Second, "reversal is not warranted when the jury is presented with alternative factual theories, but one of those theories is factually inadequate to sustain the conviction." *Batiste v. State*, 121 So. 3d 808, 840 (¶57) (Miss. 2013) (citing *Griffin v. United States*, 502 U.S. 46, 59 (1991)).  "This is because 'jurors are well equipped to analyze the evidence." *Id.* (quoting *Griffin*, 502 U.S. at 59).  We presume that the "jury was perfectly capable of sifting through the evidence and was able to discard any factually insufficient theories." *Id.* at (¶58) (quoting *Fulgham v. State*, 46 So. 3d 315, 325 (¶28) (Miss. 2010)).  Therefore, in the present case, the manslaughter conviction must be affirmed if the State presented sufficient evidence of *either* heat-of-passion manslaughter *or* culpable-negligence manslaughter—even if we find that "one of those theories is factually inadequate to sustain the conviction." *Id.* at (¶57).[5]

include any and all lesser included offenses thereof, including, but not limited to, manslaughter."); Miss. Code Ann. § 99-19-5(2) (Rev. 2015) ("[M]anslaughter shall be considered a lesser included offense of murder and capital murder, and the jury may be properly instructed thereon, upon request by either party or upon the court's own motion, in any case in which the giving of such instruction would be justified by the proof, consistent with the wording of the applicable manslaughter statute."); Michael H. Hoffheimer, *Lesser Included Offenses in Mississippi*, 74 Miss. L.J. 135, 165-66 (2004) ("Mississippi . . . treat[s] its various forms of manslaughter as lesser included offenses of murder.").

[5] Citing *Yates v. United States*, 354 U.S. 298, 312 (1957), *overruled on other grounds by Burks v. United States*, 437 U.S. 1 (1978)), Grace argues that her conviction must be set aside if there is insufficient evidence of *either* "culpable negligence" *or* "heat of passion." This is incorrect.  As the United States Supreme Court explained in *Griffin*, a general guilty verdict must be set aside if one of the possible bases of conviction is held unconstitutional or "contrary to law"—i.e., "*legally* inadequate." *Griffin*, 502 U.S. at 59 (emphasis added). However, when, as in this case, the defendant argues that the case was submitted to the jury on a "*factually* inadequate theory," a general verdict will be upheld as long there was sufficient evidence to support an alternative ground for the conviction.  *Id.* (emphasis added).

10

¶22. Thus, based on these two rules, we must affirm the manslaughter conviction in this case if the evidence was sufficient to sustain a conviction for *either* the indicted offense of depraved-heart murder *or either* theory of manslaughter that was submitted to the jury.

### A. Standards of Review

¶23. When we address a challenge to the sufficiency of the evidence, the question is not whether *this Court* "believes that the evidence at trial established guilt beyond a reasonable doubt. Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Bush v. State*, 895 So. 2d 836, 843 (¶16) (Miss. 2005), *abrogated on other grounds by Little v. State*, No. 2014-CT-01505-SCT, 2017 WL 454674, at *1, *3-*4 (¶¶1, 14-21) (Miss. Oct. 12, 2017)) (quoting *Jackson v. Virginia*, 443 U.S. 307, 315 (1979)).

¶24. "When reviewing a denial of a motion for a new trial based on an objection to the weight of the evidence, we will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Id.* at 844 (¶18). The evidence must be "[v]iewed in the light most favorable to the verdict," and we must affirm unless "[t]he trial court . . . abuse[d] its discretion in denying a new trial." *Id.* at (¶19).

¶25. The role and function of an appellate court is materially different from the "role and function of the jury." *Groseclose v. State*, 440 So. 2d 297, 300 (Miss. 1983). Our Supreme

11

Court recently made clear that when a defendant challenges the sufficiency of the evidence or argues that the verdict is against the weight of the evidence,

> neither this Court nor the Court of Appeals assumes the role of juror on appeal. We do not reweigh evidence. We do not assess witnesses' credibility. And we do not resolve conflicts between evidence. Those decisions belong solely to the jury.

*Little*, 2017 WL 4546740, at *1 (¶1); *see also id.* at *4 (¶20).

### B. Depraved-Heart Murder

¶26. As discussed above, Grace was indicted for depraved-heart (second-degree) murder, and the trial court instructed the jury on that charge. The jury found Grace guilty of the lesser offense of manslaughter; however, our Supreme Court has held that if the evidence is legally sufficient to find the defendant guilty of murder, the defendant cannot complain that she was instead convicted of manslaughter. *See supra* (¶20) & n.4. Accordingly, we discuss the sufficiency of the evidence as to the charge of murder.

¶27. Second-degree murder is "[t]he killing of a human being without authority of law" by "an act eminently dangerous to others and evincing a depraved heart, regardless of human life, although without any premeditated design to effect the death of any particular individual." Miss. Code Ann. § 97-3-19(1)(b) (Rev. 2014). "Depraved-heart murder and culpable negligence manslaughter are distinguishable simply by degree of mental state of culpability. In short, depraved-heart murder involves a higher degree of recklessness . . . ." *Hawkins v. State*, 101 So. 3d 638, 643 (¶17) (Miss. 2012). The Supreme Court has described conduct "evincing a depraved heart" as "grave recklessness manifesting utter disregard or

12

indifference to [a] resultant creation of eminent danger to [human] life." *Windham v. State*, 602 So. 2d 798, 802 (Miss. 1992). "Depraved-heart murder encompasses 'a reckless and eminently dangerous act directed toward a single individual,' from which malice is implied." *Holliman v. State*, 178 So. 3d 689, 698-99 (¶20) (Miss. 2015).

¶28. In this case, the State presented sufficient evidence of the essential elements of second-degree murder. Jay's testimony was sufficient to support the State's theory that Grace knew that Joel was sitting behind her car when she ran over him. This testimony was, at minimum, sufficient for a rational juror to find that Grace acted with "grave recklessness manifesting utter disregard or indifference to [a] resultant creation of eminent danger to [Joel's] life." *Windham*, 602 So. 2d at 802. Under Supreme Court precedent, the sufficiency of the evidence as to murder disposes of any challenge to the sufficiency of the evidence of manslaughter. *See supra* (¶20) & n.4.

### C. Culpable-Negligence Manslaughter

¶29. Under Mississippi law, "culpable negligence" is "negligence of a degree so gross as to be tantamount to a wanton disregard, or utter indifference to, the safety of human life." *Hawkins*, 101 So. 3d at 643 (¶17). Culpable-negligence manslaughter simply involves a lesser degree of "culpability" and "recklessness" than depraved-heart murder. *Id.* As there was legally sufficient evidence of depraved-heart murder, there was also legally sufficient evidence of culpable-negligence manslaughter.

¶30. While not disputing that there was legally sufficient evidence of culpable negligence,

13

the dissent argues that the verdict was against the overwhelming weight of the evidence. We disagree. Jay testified that Joel and Grace argued in the driveway as she was getting into the car, that Joel specifically told Grace that he would not allow her to leave in his car, and that Joel then sat down in the driveway behind the car. Jay testified that he then walked over to Joel and stood next to him, talked to him, and urged him to move out of the way. When Joel refused, Jay walked away, and Grace ran over Joel. If the jurors found Jay's testimony credible on these material points, they were justified in concluding that Grace knew that Joel was behind the car and intentionally backed over him. At the very least, the jury could have found that Grace drove the car toward Joel with "wanton disregard, or utter indifference to," his life. *Hawkins*, 101 So. 3d at 643 (¶17).

¶31.    The dissent's contrary analysis essentially adopts Grace's arguments that Jay's testimony was not credible because of his impaired memory and the possible influence of Joel's family. Contrary to the Supreme Court's recent decision in *Little*, *supra*, the dissent expressly asserts the prerogative to make its own judgments of "witness credibility." *Post* at (¶81).[6]  However, *Little* expressly reaffirmed that appellate courts "do not assess the witnesses' credibility" and cannot "make witness-credibility determinations." *Little*, 2017 WL 4546740, at *1, *4 (¶¶1, 20). Rather, "the jury [is] the sole judge of the credibility of the evidence and the weight and worth of their testimony." *Id.* at *4 (¶20) (quoting *Gathright*

---

[6] On this issue, the dissent tracks the arguments of the dissenting opinion in *Little*. *Compare post* at (¶81), *with Little*, 2017 WL 4546740, at *6-*7 (¶¶32-33) (Kitchens, J., dissenting).

14

*v. State*, 380 So. 2d 1276, 1278 (Miss. 1980)).

¶32. "Despite the impeachment of [Jay], the jury remained the ultimate decision-maker as to what weight and worth to give his testimony." *Jordan v. State*, 763 So. 2d 935, 937 (¶4) (Miss. Ct. App. 2000); *accord Ivy v. State*, 764 So. 2d 476, 478 (¶4) (Miss. Ct. App. 2000); *Brown v. State*, 764 So. 2d 463, 467 (¶11) (Miss. Ct. App. 2000). It is the jury's responsibility to judge the credibility of the witnesses. *Little*, 2017 WL 4546740, at *1, *4 (¶¶1, 20). "[I]t is not this Court's function to determine whose testimony to believe and as such we should not disturb a jury's finding on conflicting testimony where there is substantial evidence to support the jury's verdict." *Bridges v. State*, 716 So. 2d 614, 617 (¶15) (Miss. 1998). "The testimony of a single uncorroborated witness is sufficient to sustain a conviction, even though there may be more than one person testifying to the contrary." *Williams v. State*, 512 So. 2d 666, 670 (Miss. 1987) (citations omitted) (affirming the denial of the defendant's motion for a new trial). "Unless testimony necessary to support the jury's verdict is so implausible or so substantially impeached as to be unworthy of belief, the jury's decision in such matters is beyond the authority of a reviewing court to disturb." *Brown*, 764 So. 2d at 467 (¶9).

¶33. While Grace raised legitimate questions about Jay's memory and motives, these were ordinary issues of impeachment and credibility for a jury to resolve. There was no physical evidence or objective evidence that impeached the material points of Jay's testimony. Nor does the overwhelming weight of the evidence show Jay's version of events to be

"implausible." The jury was entitled to find Jay more credible than Grace and the other defense witnesses and return a guilty verdict.

¶34. In contrast to its treatment of Jay's testimony, the dissent is understanding of Grace's own shifting stories. The dissent notes that the day after Grace ran over Joel, "she volunteered" that her "prior stated reasons" for leaving the house "were not accurate." *Post* at (¶84). That is one way to put it, but the jury was entitled to conclude that Grace came up with a third lie only after realizing that neither of her first two stories—going to the mailbox and to retrieve Halloween decorations—provided a plausible or satisfactory explanation for how Joel ended up beneath the wheels of his car.

¶35. The dissent also says that the video in evidence "does not impeach Grace or Patricia's testimony, nor does it corroborate Jay's." *Post* at (¶86). This is an odd way to put it because the converse is (at least) as true—i.e., the video does not impeach Jay's testimony, nor does it corroborate Grace's. The video starts just before Grace backs over Joel. Joel is already seated behind the car when the video begins, and he tries to dive out of the way when he realizes that the car is moving toward him. The video does not show or suggest that he came "running out and sat down behind [the] car," as Grace claimed.[7]

_____

[7] The dissent also states that the video shows Joel sitting "directly" or "immediately" behind the car. *Post* at (¶¶64, 80, 86). However, Joel was sitting several feet behind the car—far enough back that he had time to try to dive out of the way after he realized that the car was moving toward him. In addition, the dissent states that Joel was "clearly in the middle of the vehicle's blind spot." *Post* at (¶86). However, Grace did not testify that she ever checked her mirrors, and we cannot say, based on the video alone, that Joel was "clearly" in the "blind spot." Finally, the dissent states that Grace "attempted to render aid to Joel" after she ran over him. *Post* at (¶53). However, no rendering of aid can be seen in

16

¶36. Finally, the dissent seems to credit Grace's (and her mother's) claim about a missing video that would have exonerated her. *Post* at (¶¶89-90). Grace suggested that Detective Hill "maybe . . . had forgotten" about this critical evidence. But Hill denied that he had ever seen such a video, and an expert in computer forensics testified that he found no evidence that any other video footage was saved or deleted on the day in question. The jury certainly was entitled to find Hill more credible on this point than Grace and her mother.[8]

¶37. In summary, the jury's verdict was not against the overwhelming weight of the evidence. The State and the defense presented conflicting testimony. It was up to the jury to sort out the conflicts and decide who was credible and who was not. The jurors were entitled to believe some witnesses and disbelieve others. That is the basic "role and function of the jury" in a criminal case. *Groseclose*, 440 So. 2d at 300-01. It is not the role of this Court on appeal. *Little*, 2017 WL 4546740, at *1, *4 (¶¶1, 20).

### D.   Heat-of-Passion Manslaughter

¶38. Grace also argues that her manslaughter conviction must be reversed because there was insufficient evidence that she acted "in the heat of passion." *See* Miss. Code Ann. § 97-

---

the video, and Grace testified only that she called 911.

[8] In general, the jury could have found that the testimony of Patricia and Grace's mother was biased and not credible. *See, e.g.*, *Stevenson v. State*, 738 So. 2d 1248, 1252 (¶19) (Miss. Ct. App. 1999) (refusing "to disturb the verdict of [the] jury," which was entitled to find "the State's witnesses more credible than [the defendant] and his three witnesses who, on the face of it, were subject to claims of bias by virtue of their family and emotional ties to the defendant"); *see also, e.g.*, *Bergmann v. McCaughtry*, 65 F.3d 1372, 1380 (7th Cir. 1995) ("family members can be easily impeached for bias").

3-35 (Rev. 2014); *Agnew v. State*, 783 So. 2d 699, 703 (¶14) (Miss. 2001) (defining heat of passion).

¶39. As discussed above, it is unnecessary to address this issue because there was sufficient evidence of both depraved-heart murder, *see, e.g.*, *Cole*, 405 So. 2d at 913; *Grace*, 379 So. 2d at 542, and culpable-negligence manslaughter. *Batiste*, 121 So. 3d at 840 (¶57) ("[R]eversal is not warranted when the jury is presented with alternative factual theories, but one of those theories is factually inadequate to sustain the conviction.").

¶40. In any event, under our Supreme Court's precedent, there is legally sufficient evidence of heat of passion. Jay testified that Grace and Joel were in a heated argument outside the house, and Joel told Grace "that he wasn't going to let her take the car in . . . the shape she was in." And Jay testified that he "heard . . . somebody raise[] their voice toward [Joel]."[9] Joel then sat down in the driveway behind the car to prevent Grace from leaving in the car, and Grace ran over him.

¶41. The dissent notes that there was no proof of physical contact between Joel and Grace and that Jay could not remember the subject of their argument, *post* at (¶93), but neither point requires us to reverse the conviction. Provocation may take the form of "words or acts," *e.g.*, *Agnew v. State*, 783 So. 2d 699, 703 (¶14) (Miss. 2001), and our Supreme Court has affirmed heat-of-passion manslaughter convictions on less evidence of provocation and passion than there was in this case.

_____

[9] The jury reasonably could infer that it was Grace who raised her voice and not ten-year-old Patricia.

18

¶42.    For instance, in *Jackson*, the defendant/husband claimed that an armed intruder had killed his wife, but after investigating officers unearthed no evidence of an intruder, the husband was indicted for murder and ultimately convicted of heat-of-passion manslaughter. *See Jackson*, 551 So. 2d at 135-36.  On appeal, he argued that there was no evidence of heat of passion, but the Supreme Court rejected this argument, reasoning as follows:

> The evidence in the present record reflects that Jackson and his wife were a happily married couple with no outward evidence of marital discord.  Jackson had been a law abiding citizen, a pillar of the community.  The physical facts were that Mary Nell Jackson was bludgeoned to death by repeated blows to her head with a blunt instrument, that a broken Coca Cola bottle was found at the scene, and that her wounds were consistent with the theory that the coke bottle delivered these blows.  The evidence recounted above could also lead a reasonable hypothetical juror to believe that no one was present . . . other than Jackson and his wife.  From these facts, it may fairly be said that the jury's reasonable conclusion was that some sudden and unexpected provocation—admittedly unexplained—enraged Jackson causing him to take leave of his senses for a few moments to grab a nearby object—a coke bottle—and in the heat of passion strike his wife repeatedly.  That we are without evidence of exactly what may have provoked Jackson may not on these facts serve to exclude this hypothesis as one that a reasonable juror may have found beyond a reasonable doubt to have occurred.

*Id.* at 146-47 (emphasis added).  That is, the jury could infer that "some" "admittedly unexplained" "provocation" had so "enraged" the defendant that he killed his wife—even though there no "evidence of exactly what may have provoked him."

¶43.    Similarly, in *Grace*, the defendant claimed that he shot his girlfriend by accident, but he was indicted for murder, and the jury ultimately found him guilty of heat-of-passion manslaughter. *Grace*, 379 So. 2d at 541-42.  On appeal, the defendant claimed that there was insufficient evidence of heat of passion, but the Supreme Court found sufficient evidence in

a witness's testimony that he "heard a scream followed a second or two later by a shot." *Id.* at 542. The Court reasoned that "[i]f the jury believed [this] testimony . . . , they could have reasonably inferred from this screaming that the parties were engaged in some type of dispute." *Id.* at 542. Again, the jury could simply infer that "some type of dispute" had so enraged the defendant that he killed his girlfriend.

¶44. If there was sufficient evidence of "heat of passion" in *Grace* and *Jackson*, there was in this case too. Jay testified that Joel and Grace were arguing and that the argument escalated to the point where Grace wanted to leave but Joel sat down behind the car to prevent her from doing so. Under our Supreme Court's precedent, this was sufficient for the jury to conclude that Joel's words and actions provoked Grace to a "heat of passion."

## II. Motion for a Mistrial

¶45. We review the denial of a motion for a mistrial for abuse of discretion. *Ford v. State*, 206 So. 3d 486, 491 (¶14) (Miss. 2016). Grace presented no evidence that Jay's testimony was "coached." As discussed above (*supra* ¶15), Grace's motion was based on testimony that a relative in the audience nodded his head in an "exaggerated" manner. There was no legal or evidentiary basis for a mistrial, and the trial judge did not abuse his discretion by denying the motion.

## III. Plain Error

¶46. The dissent also argues that a new trial is required because of a mistake in the jury instruction regarding culpable-negligence manslaughter, which stated as follows:

20

The Court instructs the jury that culpable negligence manslaughter is the killing of a human being, by culpable negligence and without authority of law.

The Court instructs the Jury that if you believe from the evidence in this case, beyond a reasonable doubt, that the defendant, . . . on or about November 2, 2014, in Attala County, Mississippi, killed Joel McCarty, a human being, without authority of law and by *his* culpable negligence, then the defendant is guilty of Manslaughter and it is your sworn duty to so find.

If the State has failed to prove any one or more of the above listed elements of heat of passion manslaughter or culpable negligence manslaughter beyond a reasonable doubt, then you shall find the defendant not guilty of Manslaughter.

(Emphasis added).[10] Thus, the instruction mistakenly referred to "his culpable negligence" rather than "her" (i.e., Grace's) culpable negligence. However, Grace did not raise this issue in the trial court, so any objection is procedurally barred. *See, e.g.*, *Holliman*, 178 So. 3d at 700 (¶24). Indeed, the issue is doubly barred because Grace did not raise the issue on appeal either. The dissent nonetheless contends that the mistake amounts to "plain error" requiring a new trial. We disagree.

¶47. "Under our plain-error doctrine, there has to be a finding of error, and that error must have resulted in a manifest miscarriage of justice for reversal to occur." *Williams v. State*, 134 So. 3d 732, 736 (¶15) (Miss. 2014). We will not reverse based on plain error unless the error "prejudiced the outcome of the trial." *Foster v. State*, 148 So. 3d 1012, 1018 (¶20) (Miss. 2014). Moreover, "[t]here is no per se rule requiring automatic reversal whenever

_____

[10] The court also instructed the jury that "culpable negligence" is "negligence so gross as to be tantamount to a wanton disregard of, or utter indifference to, the safety of human life."

21

jury instructions contain conflicting or potentially confusing explanations of the law." *Rodgers v. State*, 166 So. 3d 537, 544 (¶14) (Miss. Ct. App. 2014) (reading the jury instructions as a whole and holding that an erroneous self-defense instruction did not rise to the level of a "manifest miscarriage of justice" or "plain error"), *cert. denied*, 166 So. 3d 38 (Miss. 2015).

¶48. The one-word mistake in the jury instructions in this case does not rise to the level of plain error. The jury did not submit any questions about culpable negligence. Nor is there any other indication that the instructions confused the jury. Indeed, no one even noticed the mistake until after briefing was complete in this Court. Nonetheless, the dissent speculates that the jury (a) interpreted the mistake as a peremptory instruction to find Grace guilty of manslaughter based on Joel's negligence and (b) returned a guilty verdict on that basis, all without requesting clarification from the trial judge. *Post* at (¶80). Surely the idea of convicting the defendant of the victim's negligence would have struck at least some jurors as bizarre and prompted *some* question before they would have rendered a verdict on such a theory.[11] The dissent's far-fetched and unsupported speculation does not establish that the "error *must* have resulted in a *manifest* miscarriage of justice." *Williams*, 134 So. 3d at 736 (¶15) (emphasis added). Therefore, the plain-error doctrine does not apply.

¶49. Most important, the trial judge properly instructed the jury on the excuse of "accident." *See* Miss. Code Ann. § 97-3-17(a)-(b) (Rev. 2014). At Grace's request, the

[11] Notably, the jurors did send the judge a question about the definition of "heat of passion" and the elements of heat-of-passion manslaughter.

judge instructed the jury on two different statutory theories of accident—accident while doing a "lawful act by lawful means, with usual and ordinary caution," and accident "in the heat of passion." *Id.* The judge instructed the jurors that it was their sworn duty to return a verdict of not guilty if there was any "reasonable doubt" as to whether Grace had killed Joel by "accident or misfortune." *See id.* This was Grace's theory of the case and the critical issue for the jury to decide. Given that the court properly instructed the jury on Grace's theory of the case, the use of the wrong pronoun in the culpable-negligence instruction does not rise to the level of a "manifest miscarriage of justice." *See Rodgers*, 166 So. 3d at 544-47 (¶¶14-30).

## CONCLUSION

¶50. The conviction is affirmed because the evidence was sufficient to convict Grace of murder or manslaughter; the jury's verdict finding her guilty of manslaughter is not against the overwhelming weight of the evidence; the trial judge did not abuse his discretion by not declaring a mistrial; and the previously unnoticed mistake in the jury instructions does not rise to the level of plain error or a manifest miscarriage of justice.

¶51. **AFFIRMED.**

**IRVING AND GRIFFIS, P.JJ., BARNES AND FAIR, JJ., CONCUR. GREENLEE, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY LEE, C.J., CARLTON AND WESTBROOKS, JJ. TINDELL, J., NOT PARTICIPATING.**

**GREENLEE, J., DISSENTING:**

¶52. McCarty appeals her conviction in Attala County Circuit Court of manslaughter for

23

backing over her husband Joel in their home's driveway. The majority affirms the circuit court's decision. The majority reasons that there was sufficient evidence to convict Grace of murder and manslaughter; the jury's verdict was not against the overwhelming weight of the evidence; the trial judge did not abuse his discretion by not declaring a mistrial; and the mistake in the jury instructions does not rise to the level of plain error or a manifest miscarriage of justice. I respectfully disagree and therefore dissent.

## FACTUAL BACKGROUND

¶53.    On the evening of Sunday, November 2, 2014, Grace, Patricia (Grace's ten-year-old daughter), Joel (Grace's husband), and Jay (Joel's son) were at Joel and Grace's home. Joel's Chrysler PT Cruiser was parked in the driveway beside their home. Grace and Patricia got in the car to back out of the driveway. Joel sat down, cross-legged, behind the car before it backed up. As Grace backed the car, Joel was hit—the car running over Joel. Grace stopped the car, exited (as did Patricia), and attempted to render aid to Joel. Patricia began screaming. Jay ran from the front of the house to where Joel lay and began yelling and asking what had happened. Patricia continued to be upset  and protective of her mother, telling Jay to "get away from her" as he approached. Grace immediately called 911 requesting assistance and imploring them to come quickly, as she attempted to calm Patricia and deal with Jay. After the ambulance arrived, Joel was taken to an area hospital where he died from his injuries. Later that evening, Grace was taken into custody for driving without a valid driver's license.

¶54.    The following morning while in jail, Grace met with Detective  Hill of the Kosciusko

24

Police Department, who was investigating the incident. After waiving her *Miranda*[12] rights, Grace told Detective Hill that she and Patricia were leaving the house because Joel was in a drunken, emotional state and Joel was arguing with his son Jay. She stated that she was trying to get herself and Patricia away from Jay's and Joel's agitated states. She also stated that at no time did she ever see anyone else outside of the house, nor did she ever know that Joel was behind the car. Grace told Detective Hill of security cameras in operation at the house and offered to go with him to the house to view the footage. After viewing the footage, Detective Hill took possession of the "system and entire monitors," which included a secure digital (SD) card containing the footage. Ten-year-old Patricia also met with Detective Hill the same day.

¶55. Detective Hill experienced trouble in scheduling an interview with Jay. He managed to interview Jay almost three months after the incident. That interview occurred after police reports and surveillance footage concerning the incident were obtained by Jay and Joel's extended family. The details of Jay's statements to Detective Hill were not in the record.

¶56. This case was presented to the Attala County grand jury, which returned an indictment for Grace for second-degree murder in violation of Mississippi Code Annotated section 97-3-19(1)(b) (Rev. 2014). The case proceeded to trial.

## TESTIMONY

¶57. Grace's testimony corroborated her prior statements to Detective Hill. Patricia

---

[12] *Miranda v. Arizona*, 384 U.S. 436 (1966).

testified that she "didn't see anybody" outside, except for Jay on the sidewalk in front of the house, but that she did not see him until they were "backing out." When asked if she ever saw Joel come outside, she said,"No, sir." When asked for the first time she saw Joel, she said, "Whenever we backed over him."

¶58. Jay, the deceased's son, was not related to either Grace or Patricia. Along with Joel, Grace, and Patricia, Jay was at the house that evening. His testimony alone challenged Grace's and Patricia's. Jay's mental capacity has been impaired because of a prior accident.

¶59. At the pretrial-motion hearing, Grace moved to challenge Jay's competency to testify at trial. Some years prior, Jay was involved in an automobile accident. In describing his abilities post-accident, Jay testified:

> It messed my mind up a good little bit but my mental doctor sent me to – – it was some kind of special school that I had to go to [sic] learn to read and some rehabilitation like that. I could remember certain things but somebody really got me riled up or something I would forget it real quick. And they got me on medicine to keep me calm like that.

The trial court found Jay competent to testify based on his "ability to recall the events of the night in question." Jay also testified during trial to his cognitive disabilities, saying that when his heart rate speeds up and he gets excited, that triggers his memory loss. Jay also testified, "I have to keep my pen and notebook for certain things, you know. If I think it is serious I make a note. And every night before I go to bed I get my notebook out and see what happened . . . ." But when asked if he wrote down anything from the night of the incident, he said, "No sir. Certain things stick, like what happened to Daddy I do remember certain

things, you know."

¶60.    At trial, Jay testified that it was Grace and Joel that were arguing that evening both inside the house and outside in the front, and:

> I don't know what they were arguing about, but Ms. Grace was going to leave and go somewhere. And he said he wasn't going to let her take his car to go nowhere that he would take her somewhere or he would make a call for somebody to come pick her up. And they were arguing and they were standing out there in front of the house and they kept arguing something. And I started––Daddy said, "Go back inside. It will be all right, Jay."

After an objection, Jay was asked if he said Joel and Grace were having an argument about her taking the car. He continued:

> Well, I don't know what they were ––I thought that's what it was because she was getting in the car wanting to go somewhere. I don't know if they got in an argument before that or what but that's what he said that she wasn't taking the car nowhere. He could call somebody to come get her or something because he said, "That's the only vehicle I got right now and you're not taking it."
>
> . . . .
>
> Ms. Grace was in the car and Daddy had walked up ––there's a hill going up the driveway and about middle ways of the hill there is a crack going across the driveway. And that's where Daddy, he sat down across the crack. And I walked around and I told him, "Daddy don't do this crap." I said, "Get up and come back in or whatever." And he said, "No. No. Go in. It is all right, Jay. We are arguing about this and whatever." And I went to go back in the house and about—there is a walkway that goes down the driveway and then it turns and goes to the other side of the house and you can't see what's going on. And I heard the tires on the car. And I turned around to go back and she had hit him. And about that time I heard the lump but I didn't see it.

Jay later testified, "I can't remember real good. I keep thinking and thinking about it but I can't bring around exactly how it happened and I don't want to lead y'all wrong."

27

¶61.   When asked how many times Jay had talked about what happened that night with other McCarty family members, specifically his brother and uncle, he testified, "A good little bit. Because – a good bit. Because I would ask him, like I say, I'm really forgetful. Like he would tell me something and I would leave the room and a couple of minutes later and come and say explain that to me. I would start repeating what he said. I would say, see, I just lost it again. Tell me again exactly what happened, what you said happened."

¶62.   Toward the close of Jay's testimony, he reiterated, "I'm trying to remember exactly how it happened. The more I think about it the more it makes my mind [sic] because I get madder and madder that I can't remember exactly."

### SURVEILLANCE VIDEO

¶63.   The surveillance footage shown to the jury was from a camera on the driveway side of the house pointed up the length of the driveway toward the street. According to testimony, the video footage showed two moments discrete in time: when the car containing Grace, Jay, Joel, and Patricia pulled into the driveway returning home from earlier in the day, interrupted by blank video, and then it showed the moment the car struck Joel. However, the only video footage found in the record is an approximately thirty-three-second clip of when the car driven by Grace began to back out of the driveway, running over Joel.

¶64.   The video found in the record begins with the moment the car starts backing up— Grace and Patricia inside, windows up, and Joel visible seated cross-legged directly behind the vehicle, in the vehicle's blind spot. As the car backed up the hill out of the driveway, Joel

28

began to get up in attempt to get out of the way. The car knocked Joel down and ran over him. Grace decelerated after the first thump stopping the car. She and Patricia got out and went to Joel. The video shows Jay then running over from the front of the house after Grace and Patricia are already out of the car.

¶65.     In the accompanying audio, outside of an incognizable sound at the start of the video, the following is audible: the vehicle's engine running as it is given gas to back up the hill, a thud from the back wheel as it runs over Joel, the engine decelerating at the first thud, the second thud as the front wheel runs over Joel, Patricia screaming inside the car immediately after Joel is hit and after she and Grace exit the car, Jay yelling incognizably, and Patricia imploring Jay to "leave her alone."

¶66.     Detective Hill testified that his reports indicated that he saw footage from a camera that looked directly at the front porch and that he saw a "disco ball" hanging from the porch awning. But Detective Hill then testified that his prior report was mistaken and that he must have been thinking of a photo he had taken of the same area with the same disco ball in the frame.

¶67.     Grace testified concerning what she saw while watching the video at her house with Detective Hill. According to Grace, the video showed "my daughter running down the sidewalk. I hear me saying 'run, run, run' and then the doors are still open on the car even. I guess – the doors are open, like we open doors up, and you could see in the video that Joel comes running out and sat down behind my car. He squatted his legs and he sat."

29

¶68. Kendall Blaylock testified on behalf of the State as an expert in computer forensics regarding the surveillance footage. Blaylock partially addressed the abrupt beginning of the video-camera footage that was shown to the jury. Blaylock testified that there were two camera views recorded on the SD card for the surveillance system: one along the side of the house looking up the driveway toward the street, and the other viewing the "front walk" of the house. Blaylock testified, however, that only footage from the driveway view was found on the SD card for the day of the incident. Blaylock testified that the camera looking at the front of the house last recorded to the SD card on October 31, and for no explicable reason, it stopped recording to the SD card after that date. He testified that video files had been deleted from the SD card, stating that those deletions looked to be in the "normal operation of the system[.]" Blaylock also testified that "there were some files that I'm not able to put a date on, but those didn't look to come from that time either." Blaylock testified that he wanted to look at the actual computer itself and not just the SD card because

> [e]ven if it was recording straight to the SD card, I would want to be able to look at the computer because you may be backing up archive videos to the computer. You know, just like backing up pictures from a camera, I may want to save those to my computer at some point. The other thing is the potential or something recording straight to a computer, I may want to be able to see that. Any time, honestly, you know, if I saw a computer sitting next to other digital equipment, I would want to see what was on the computer.

Blaylock further testified that he never had access to the actual computer and that there was no way for him to know if there was footage from the surveillance system stored directly on the computer.

## JURY'S INSTRUCTIONS AND VERDICT

¶69. Among the jury instructions given was Instruction 5 (S-2), which instructed the jury that, should it find the State failed to prove that Grace was guilty of second-degree murder, then it should proceed with deliberations on the lesser-included offense of manslaughter. The instruction describes two kinds of manslaughter: heat-of-passion manslaughter and culpable-negligence manslaughter. Particularly troubling, the section on culpable-negligence manslaughter read as follows:

> The Court instructs the Jury that if you believe from the evidence in this case, beyond a reasonable doubt, that the defendant, Grace Ann McCarty a/k/a Grace Ann Woods a/k/a Grace Ann Proctor, on or about November 2, 2014, in Attala County, Mississippi, killed Joel McCarty, a human being, without authority of law and by *his* culpable negligence, then the defendant is guilty of Manslaughter and it is your sworn duty to so find.

(Emphasis added).

¶70. The jury returned its verdict and found Grace "guilty of manslaughter." Grace moved for a judgment notwithstanding the verdict and a new trial, both of which were denied, and she timely appealed to this Court.

¶71. The jury did not state under which theory of manslaughter they found Grace guilty, nor did the trial court inquire into such; however, the "Notice of Criminal Disposition" from the trial-court clerk's office stated that Grace was sentenced under Mississippi Code Annotated section 97-3-47 (Rev. 2014), the culpable-negligence-manslaughter statute.

## DISCUSSION

¶72. Grace's appeal argues that (1) the evidence was insufficient, (2) the verdict was

against the overwhelming weight of the evidence, and (3) the trial court abused its discretion in denying her motion for a mistrial.[13]

¶73. The majority affirms the jury's verdict, finding that there was sufficient evidence to convict Grace of murder or manslaughter; that the jury's verdict finding Grace guilty of manslaughter was not against the overwhelming weight of the evidence; and that the error in the jury instruction did not constitute plain error or a manifest miscarriage of justice.

¶74. However, the trial court improperly instructed the jury on culpable-negligence manslaughter focusing the jury on "*his* culpable negligence," but not her culpable negligence, which is plain error. Further, the evidence for the jury's verdict is insufficient for heat-of-passion manslaughter, and due to the lack of evidence presented and its conflicting nature, allowing the jury's verdict for culpable-negligence manslaughter to stand would sanction an unconscionable injustice. Therefore, I respectfully dissent.

¶75. Due to the plain error in instructing the jury, this case should be reversed and remanded. It is unclear which manslaughter the jury found Grace guilty of committing, heat-of-passion manslaughter or culpable-negligence manslaughter. Though the improper jury instruction is plain error, for which the unspecified verdict should be reversed and remanded, a discussion of the evidence presented for heat-of-passion and culpable-negligence manslaughter remains warranted.

## I. Culpable-Negligence Manslaughter

---

[13] Because I would find Grace's first two errors dispositive of her appeal, I decline to address her third that the trial court abused its discretion in denying her a mistrial.

¶76.    Mississippi Code Annotated section 97-3-47 states that "[e]very other killing of a human being, by the act, procurement, or culpable negligence of another, and without authority of law, not provided for in this title, shall be manslaughter." Culpable negligence is defined as "the conscious and wanton or reckless disregard of the probabilities of fatal consequences to others as a result of the wilful creation of an unreasonable risk thereof." *Chandler v. State*, 946 So. 2d 355, 361 (¶22) (Miss. 2006). The supreme court has also defined culpable negligence as "such gross negligence as to evince a wanton or reckless disregard for the safety of human life, or such an indifference to the consequences of an act under the surrounding circumstances as to render such conduct tantamount to willfulness." *Id*. (quoting *Shumpert v. State*, 935 So. 2d 962, 967 (¶14) (Miss. 2006)).

### a.    Jury Instruction

¶77.    A review of the jury instruction for culpable-negligence manslaughter reveals that the jury was instructed to determine Grace's guilt or innocence based on "***his*** culpable negligence," that being Joel's, not Grace's. (Emphasis added).

¶78.    The majority admits that this jury instruction was in error, but finds that it does not rise to the level of plain error and that the issue is procedurally barred because it was not objected to at trial nor raised on appeal. However, the instruction given to the jury created "plain error" and, therefore, the court may review the record and address the unpreserved issue on appeal." *Lafayette v. State*, 90 So. 3d 1215, 1220 (¶18) (Miss. 2012). "To determine if plain error has occurred, this Court must determine if the trial court has deviated from a

33

legal rule, whether that error is plain, clear, or obvious, and whether the error has prejudiced the outcome of the trial." *Id*. Here, the legal rule involved is that the jury instructions, when read together, must "convey the law of the case and create no injustice . . . ." *Carson v. State*, 212 So. 3d 22, 28 (¶22) (Miss. 2016). To do otherwise is reversible error. *Id*.

¶79. Here, "[t]he statutory elements of culpable-negligence manslaughter are an unlawful killing by the culpable negligence of another." *Gebben v. State*, 108 So. 3d 956, 968 (¶34) (Miss. Ct. App. 2012) (internal quotations omitted). Thus, "[t]he causation element is present in this definition—the unlawful killing must be a result of the ***defendant's*** culpable negligence." *Id.* (emphasis added). Therefore, the trial court's instructions to the jury must have contained, in some form, that Grace's culpable negligence caused Joel's death. However, instruction 5 (S-2) required the jury to find Grace guilty of culpable-negligence manslaughter by "***his*** [(Joel's)] negligence" (emphasis added). This resulted in plain error. "Failure to instruct the jury on the essential elements of the crime is plain error." *Wordlaw v. State*, 218 So. 3d 768, 769 (¶8) (Miss. Ct. App. 2017).

¶80. The record reveals that Joel sat cross-legged in the driveway uphill and immediately behind a running automobile, in the middle of the back of the car and in its blind spot, before it backed out. While such behavior by Joel could be described as negligence "of a degree so gross as to be tantamount to a wanton disregard of, or utter indifference to, the safety of human life," the jury instruction provided the law that Grace could be found guilty of manslaughter based upon Joel's culpable negligence. This equates to a peremptory

34

instruction, requiring the jury to find Grace guilty, if it found that Joel was culpably negligent.  Such is an error which is "plain, clear, and obvious," and clearly "prejudiced the outcome of the trial." As such, it is reversible error.

### b. Sufficiency and Weight of the Evidence of Culpable-Negligence Manslaughter

¶81.    Further, the majority finds that the jury's verdict was not against the weight of the evidence because the State and defense presented conflicting testimony. The majority reasons that as appellate courts, the supreme court and court of appeals "do not make independent resolution of conflicting evidence," but rather "the jury [is] the sole judge of the credibility of witnesses and the weight and worth of their testimony." *Little v. State*, 2014-CT-01505-SCT, 2017 WL 4546740, at *4 (¶20) (Miss. Oct. 12, 2017).  Although I understand the newly clarified standard promulgated in *Little*, I would find that in order to review whether a "a verdict . . . is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice" requires the court to evaluate the weight of the entire evidence— which inevitably involves the consideration of witness credibility.

¶82.    Upon review, Jay testified but then appeared to simultaneously recant, disqualify, and impeach his own testimony. He testified as to his version of that night, but that he really was not sure, could not remember, or did not want to misspeak to the trial court. There was also Jay's impairment at the time of the incident and at trial. He said his impairment causes memory loss when his heart rate speeds up and when he gets excited. The surveillance

35

footage, the recorded 911 call, and the testimony of the first responders suggest that Jay was highly agitated that night. Jay also stated he makes notes in his journal every night of everything important that happened during the day so that he does not forget. Jay testified that he did not make any notes of that night and no entries of that night, were brought into evidence. Jay also testified that he cannot remember what happened; that his brother would have to tell him what happened; and that he would walk off, try to process it, and then go back to his brother and have his brother tell him again how the events occurred because he had forgotten. Yet he testified that he remembered what happened that night because "some things stick."

¶83.    It is noteworthy that Jay was not made available for a police interview until after Joel and Jay's extended family acquired the police reports and the surveillance footage.

¶84.    As noted by the trial court, Grace maintained that she never even knew Joel was outside, let alone behind the car. She testified that she never saw anyone outside. She testified that it was Jay and Joel arguing in the house that evening and that she was leaving with Patricia to get away from them. She did give different reasons for operating the car to the 911 operator and first responders, but when she talked with Detective Hill she volunteered that her prior stated reasons were not accurate and that she was trying to leave because Jay and Joel were arguing. She stated that she did not state the same to the 911 operator and the first responders "because I was afraid I was not going to be able to go to the hospital because I had no license. I had a suspended license. And I was afraid that if I told

36

them that, I wouldn't be able to make it to the hospital. And I knew he was in really bad shape." Her reasoning appears corroborated because she was indeed arrested for driving with a suspended license while she was at a gas station en route to the hospital with Shay, also Joel's son.[14]

¶85.    Patricia's testimony corroborated Grace's. She testified that Jay and Joel were arguing that night, that she and Grace were leaving the house to get away from them, that she was unaware anyone else was outside until she saw Jay standing in front of the house on the sidewalk as they were backing out, and that she did not know Joel was outside until after she realized they hit him.

¶86.    The video found in the record does not impeach Grace or Patricia's testimony, nor does it corroborate Jay's. At the start of the video, the PT Cruiser is backing up with Grace and Patricia inside, windows up, and no one else visible except Joel, who is seated cross-legged directly behind the vehicle and clearly in the middle of the vehicle's blind spot. As the car backs up the hill out of the driveway, Joel attempts to get out of the way. Grace stops the car, and she and Patricia get out and go to Joel. Jay comes running over from the front of the house after Grace and Patricia are already out of the car.

¶87.    In the accompanying audio, besides an incognizable sound at the start of the video,

_____

[14] Per Detective Hill's testimony, "Captain [Herbert] Due [of the Kosciusko Police Department] advised me that his shift answered a call later at [a gas station] involving Grace Ann McCarty and Shay McCarty. They were having an argument. Captain Due advised me that Grace Ann had admitted to driving to [the gas station] and that her driver's license were [sic] suspended and she was taken into custody for some misdemeanor charges."

the following is audible: the engine running as it is given gas, the thuds from both sets of axle-wheels as they hit Joel, the engine immediately stops revving at the first thud, Grace and Patricia get out, Patricia screaming inside the car immediately after Joel is hit and after she exits the car, Jay yelling incoherently, and Patricia yelling "leave her alone."

¶88.    The video begins abruptly after blank footage with Grace and Patricia in the car and Joel sitting cross-legged behind it. The failure of the surveillance system to record the scene before then is unexplained.

¶89.    According to Grace, when at the house viewing the video with Detective Hill she saw "[her] daughter running down the sidewalk. I hear me saying 'run, run, run' and then the doors are still open on the car even. I guess – the doors are open, like we open doors up, and you could see in the video that Joel comes running out and sat down behind my car. He squatted his legs and he sat."

¶90.    Grace testified that after Detective Hill had viewed the video, she was outside with her mother when Detective Hill said "that he didn't feel like this would ever go to trial, it would ever go before the grand jury. It was obvious that I had not, there was no way I could see that he ran –  that I ran over him. There was no way you could see it." Grace's mother, Patricia, corroborated Grace's testimony. Grace's mother testified that, while she, Grace, and Detective Hill were in front of the house, Detective Hill said, "it is plain to see that you could not have seen him. That it shouldn't even go before the grand jury." Detective Hill denied making the statement.

## II.    Heat-of-Passion Manslaughter

¶91.    Mississippi Code Annotated section 97-3-35 (Rev. 2014) states that "[t]he killing of a human being, without malice, in the heat of passion, but in a cruel and unusual manner, or by the use of a dangerous weapon, without authority of law, and not in necessary self-defense, shall be manslaughter." "Heat of passion" is

> a state of violent and uncontrollable rage engendered by a blow or certain other provocation given, which will reduce a homicide from the grade of murder to that of manslaughter. Passion or anger suddenly aroused at the time by some immediate and reasonable provocation, by words or acts of one at the time. The term includes an emotional state of mind characterized by anger, rage, hatred, furious resentment or terror.

*Batiste v. State*, 121 So. 3d 808, 844 (Miss. 2013) (¶70) (quoting *McCune v. State*, 989 So. 2d 310, 319 (¶15) (Miss. 2008)). "[T]he impassioned reaction of the accused must have been reasonable: the passion felt by the person committing the act should be superinduced by some insult, provocation, or injury, which would naturally and instantly produce, in the minds of ordinarily constituted men, the highest degree of exasperation." *Abeyta v. State*, 137 So. 3d 305, 310 (¶10) (Miss. 2014). "There must be such circumstances as would indicate that a normal mind would be roused to the extend that reason is overthrown and passion usurps the mind destroying judgment." *Id*. at 310-11 (¶10). Additionally, "*words alone* and *disagreements among people* are not enough to invoke the passion required for this defense. Mere words, no matter how provocative, are insufficient . . . ." *Id*. (emphasis added).

¶92.    The majority finds that the State presented sufficient evidence of the essential elements of second-degree murder and culpable-negligence  manslaughter and, therefore,

finds it unnecessary to address heat-of-passion manslaughter. However, and perhaps more interestingly, the trial judge during consideration of the jury instructions stated:

> The only manslaughter instruction I honestly see that might be appropriate is culpable negligence because there – I have not seen any or heard testimony that she was enraged or in some kind of heat of passion when she backed over him. I mean, her testimony was that she didn't even know he was there. I don't see how it can possibly be a heat of passion – I'm certainly open to hearing discussion on the issue but my initial thought is how is it a heat of passion? You have got to have her saying that, you know, she was enraged about something that he had done and backed over him. And the only thing she has maintained is she didn't even know he was there at all.

After a review of the colloquy on the jury instructions, it appears the only reason the trial judge granted the instruction on heat-of-passion manslaughter is that neither side objected to giving the instruction and the State's sole reason for requesting it was based on testimony of Joel and Grace's purported "arguing" as heat of passion.[15]

¶93. Here, there was no testimony that Grace and Joel even physically touched one another that night, let alone during their purported argument. And according to Jay, the argument was possibly about Grace using the car to leave. There was no evidence that Grace was enraged or that passion had usurped her mind. That is insufficient to provide the necessary provocation for heat-of-passion manslaughter because "disagreements among people are not enough" to claim heat of passion. As such, there is no way a "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

¶94. There was insufficient evidence to provide the basis for a conviction of heat-of-

---

[15] Grace's trial counsel initially objected to giving the heat-of-passion instruction, but after an off-the-record conference with Grace, he agreed to it.

passion manslaughter. Therefore, the evidentiary weight of the same need not be addressed.

## CONCLUSION

¶95.     Though not cited as error on appeal, the court's instruction to the jury that Grace could be found guilty of manslaughter because of "***his*** [(Joel's)] culpable negligence" (emphasis added) created plain error that "caused a manifest miscarriage of justice." *Little*, 2017 WL 4546740, at *10 (¶46). Further, considering the evidence presented and its nature as discussed above, allowing the jury's verdict for culpable-negligence manslaughter to stand would sanction an unconscionable injustice. The case should be reversed and remanded because of the plain error in the improper instruction of the jury on culpable-negligence manslaughter. Also, the evidence submitted was insufficient on heat-of-passion manslaughter to uphold a conviction of that crime. Therefore, I dissent.

**LEE, C.J., CARLTON AND WESTBROOKS, JJ., JOIN THIS OPINION.**